**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL C. MAYO,<br><br>        Plaintiff,<br><br>        v.<br><br>LARRY GAVIN, KAREN JONES-HAYES,<br>DAMITA DELITZ, BRENDON<br>LOMBARDI, DIRECTOR MILLER,<br>OFFICER BUCHANAN, THOMAS DART,<br>AND LIEUTENANT DOUGE,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **1:21-cv-04653**<br><br>     Hon. Judge Robert M. Dow, Jr.<br>     Mag. Judge M. David Weisman |

## THIRD AMENDED COMPLAINT

Plaintiff Michael C. Mayo, by and through his attorneys, complains against Larry Gavin,

Karen Jones-Hayes, Damita Delitz, Brendon Lombardi, Director Miller, Officer Buchanan, and

Lieutenant Douge, in their individual capacities; and Sheriff Thomas Dart, in his official

capacity, and states as follows:

## PRELIMINARY STATEMENT

1.      This case centers on Defendants' actions during and after an April 29, 2020 riot in

Division 8/3G where Mr. Mayo, a detainee awaiting trial in the Cook County Department of

Corrections (the "Cook County Jail" or the "Jail"), is housed.  Defendants intentionally ignored

the dangerous conditions giving rise to the riot, and failed to protect Mr. Mayo from rioting

inmates, who threw objects at him and sprayed him with mace; failed to treat Mr. Mayo for

injuries sustained during the riot; handcuffed him despite a medical order that prohibits

handcuffing Mr. Mayo, who is a disabled veteran and uses a cane to walk; ignored Mr. Mayo's

pleas to be transported by elevator and instead forced him to walk down several flights of stairs;

left Mr. Mayo unattended for 15 minutes after he collapsed in the stairwell, sustaining significant injuries, as a result of having been forced to walk down several flights of stairs; left Mr. Mayo, who was wearing only his underwear, in a cold cell for over 12 hours, and failed to administer any of his critical medications during this period.

2.　　　After Mr. Mayo's collapse, and given his immobility and injuries, he was provided a wheelchair to facilitate his transfer to another division while the Jail's Emergency Response Team (ERT) regained order in Division 8/3G.  Three weeks later, on May 21, 2020, Sergeant Lombardi—purporting to act at the direction of Jail medical staff—confiscated the wheelchair because Mr. Mayo did not have a formal prescription to possess it.  In the course of confiscating the wheelchair, Sergeant Lombardi assaulted Mr. Mayo, resulting in significant injuries from which Mr. Mayo continues to suffer.  In an attempt to cover-up the assault, Sergeant Lombardi issued a citation to Mr. Mayo that contained falsehoods.

3.　　　Mr. Mayo subsequently grieved the assault, after which Sergeant Lombardi— motivated by Mr. Mayo's protected activity—embarked on a persistent and egregious pattern of retaliatory harassment against Mr. Mayo.

**JURISDICTION AND VENUE**

4.　　　This action is brought pursuant to 42 U.S.C. § 1983 for violations of Mr. Mayo's constitutional rights under the Fourteenth Amendment and constitutional Amendments incorporated therein as against the states.  This Court has jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).  Venue is proper is this judicial district pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Mr. Mayo's claims occurred in Cook County, Illinois.

**PARTIES**

5.　　　Plaintiff Michael C. Mayo is, and was at all relevant times herein, a pretrial detainee at the Cook County Jail.

6.      Mr. Gavin was at all relevant times an Assistant Executive Director at the Cook County Jail, and is sued in his individual capacity.

7.      Ms. Jones-Hayes was at all relevant times a Superintendent at the Cook County Jail, and is sued in her individual capacity.

8.      Ms. Delitz was, at various points relevant to this complaint, a Sergeant and a Lieutenant at the Cook County Jail, and is sued in her individual capacity.

9.      Mr. Lombardi was at all relevant times a Sergeant at the Cook County Jail, and is sued in his individual capacity.

10.      Mr. Miller was at all relevant times an Executive Director at the Cook County Jail, and is sued in his individual capacity.

11.      Officer Buchanan and Lieutenant Douge are employees of the Cook County Jail who served, either in a full- or part-time capacity, on the Jail's ERT during the events alleged herein, and are sued in their individual capacities.

12.      Thomas Dart is the Cook County Sheriff, and is sued in his official capacity.

13.      All defendants acted within the scope of their employment at the Cook County Jail during the events described in this complaint, and therefore acted under color of law of the State of Illinois.

## STATEMENT OF FACTS

**The Jail Staff Reduces Controls Designed to Maintain Order, and Fosters an Antagonistic Climate Requiring Frequent Use of the ERT**

14.      Throughout March and April of 2020, during the height of uncertainty related to the Covid-19 pandemic, conflicts between Jail inmates and Jail staff substantially proliferated due to the Jail's failure to implement basic health precautions recommended by state and federal health officials.  While inmates intently watched cable news programming announcing the latest

recommendations and describing the unfolding global pandemic, Jail staff, upon information and belief, did not communicate with inmates regarding the Jail's plans (if any) to protect inmates from Covid-19.

15.     In a futile attempt to mollify growing unrest amongst Jail inmates, Jail staff began loosening restrictions on television and phone access, among other measures not intended to address the Covid-19 pandemic in the Cook County Jail.

16.     At the same time, Jail staff reduced or eliminated measures designed to ensure order in the Jail, and reduced other services leading to unsanitary conditions.  For example, upon information and belief, correctional officers substantially reduced or altogether ceased periodic walk-throughs of various divisions, and failed to collect refuse which led to overflowing garbage bins.  See *https://southsideweekly.com/not-getting-no-treatment-cook-county-jail-covid/* (recounting interviews of Division 8 detainees conducted on April 6 and 7, 2020).

17.     Relying on Jail policies issued in response to the Covid-19 pandemic, correctional officers who had previously ensured order amongst inmates by standing guard inside the tier to which they were assigned began routinely opting—pursuant to a permissive, but not mandatory, policy—to stand guard outside of such tiers.

18.     Amidst this environment, in March and April of 2020, Jail staff increasingly lost control of various subdivisions of the Jail, in turn leading to a marked increase in the deployment of the Jail's ERT to restore order.

**Division 8/3G Was Especially Vulnerable to Riotous Outbreaks Caused by the Jail's Reduction in Controls Designed to Maintain Order and Consequent Reliance on the ERT**

19.     Division 8/3G, where Mr. Mayo is housed—and was at all times relevant to this complaint—is part of a Residential Treatment Unit (RTU) designed for the provision of medical

4

care to detainees with injuries and other serious medical conditions that could not be adequately treated in other divisions.

20.     Because of their medical conditions, detainees in Division 8/3G were especially vulnerable to serious disease or death from exposure to SARS-CoV-2.  Detainees in Division 8/3G, by virtue of their medical conditions, were also especially vulnerable to physical mistreatment, and faced heightened risk from prison fights and riots, or the use of force by correctional personnel.

21.     Upon information and belief, in March and April 2020, multiple detainees in Division 8 died from, or became seriously ill with, Covid-19.

22.     Upon information and belief, in March and April of 2020, Jail staff reduced or eliminated healthcare measures previously in place to care for detainees housed in Division 8. *See https://southsideweekly.com/not-getting-no-treatment-cook-county-jail-covid/* (Division 8 detainee undergoing chemotherapy relaying: "I don't have any medicine[,] I'm not seeing the doctors[,] [t]he nurse is not coming").

23.     Upon information and belief, in March and April of 2020, Jail staff substantially reduced or eliminated measures previously in place in Division 8 to ensure safety of detainees and maintain order of the Division.  *See id.* ("You know, the officers don't even come on this deck where we at. We pretty much monitor and watching ourselves. The officers go around with gloves and masks. We have nothing.").

24.     Division 8/3G is a dormitory-style unit—the 39 detainees housed therein do not have dedicated cells, and instead reside on bunk beds in a single room.  Division 8/3G detainees thus cannot retreat to a cell in order to protect themselves from aggressive or violent conduct by other detainees.

25.     At some point in March or April of 2020, Division 8/3G was transformed into a "covid-designated" division.  As a result of such designation, inmates from other divisions who had tested positive for Covid-19 or had been exposed to an inmate who had tested positive for Covid-19 were transferred from their assigned divisions to Division 8/3G while their illnesses subsided or their period of "quarantine" ran its course.

26.     By virtue of Division 8/3G's designation as a "covid-designated" division, multiple inmates whose violent or otherwise disruptive behavior at the Jail rendered them flatly ineligible to be housed in a dormitory-style tier (and instead required them to be housed in cells) were being housed in Division 8/3G alongside inmates (including Mr. Mayo) whose substantial medical needs, and non-violent and compliant behavior at the Jail, entitled them to be housed in Division 8/3G.

27.     At some point in March or April of 2020, Defendant Miller promulgated a policy under which no inmate in a "covid-designated" division could be transferred out of such division without the approval of an executive director, even if an inmate was engaging in violence or other misconduct that poses a risk to other detainees.

28.     Upon information and belief, Defendant Dart either directed Defendant Miller to adopt such policy, or Defendant Miller adopted the policy pursuant to final policymaking authority that had been delegated to him by Defendant Dart.

29.     In the alternative, and upon information and belief, Defendant Dart ratified Defendant Miller's issuance of such policy on or before April 28, 2020.

**Jail Staff Ignores Deteriorating Conditions in Division 8/3G and Fails to Protect Mr. Mayo from Rioting Detainees**

30.     On the evening of April 28, 2020, a Division 8/3G detainee created a liquid intoxicant (referred to by detainees and Jail staff as "hooch") from prescription medications.

6

Several detainees ingested the hooch, became intoxicated, and harassed the dormitory throughout the night, including by stealing personal possessions of other detainees.

31.     Division 8/3G correctional officers were aware of this activity, but took no measures to restore order in the Division aside from confiscating some, but not all, of the hooch.

32.     Jail staff assigned to Division 8/3G during the 11:00pm to 7:00am shift (from April 28, 2020 to April 29, 2020) would have transferred the detainees engaging in misconduct to another division better-equipped to constrain their disruptive behavior, but the policy promulgated by Defendant Miller required executive director approval before doing so.  Jail staff did not rouse any executive director to secure the required approval, so the problematic detainees remained in Division 8/3G.

33.     Many or all of the detainees participating in the above conduct were in Division 8/3G due to covid protocols, and absent such protocols, these detainees would never have been housed in a dormitory-style division due to their violent nature and behavior at the Jail, and would instead have been in a division with cells.

34.     At or around 7:30 am the following morning (April 29, 2020), the intoxicated and disorderly detainees asked Jail staff to turn on the television and enable the Division's telephone bank.  Jail staff denied the request, and, upon information and belief, the telephones and televisions were never activated.

35.     Because Defendants withdrew the primary means by which Jail staff were ensuring safety and order in Division 8/3G (television and phones), the intoxicated inmates began rioting.

36.     Multiple fist fights ensued, and detainees acquired various objects, including correctional staff phones/computers and mop buckets, and began using them as weapons.  One detainee acquired a can of mace and sprayed it throughout the Division.

37.     Mr. Mayo did not participate in any of this conduct, and attempted to stay out of the fray by remaining on his bed.

38.     Because of the dormitory-style layout of Division 8/3G, Mr. Mayo was unable to protect himself and was hit with multiple implements and sprayed with mace, sustaining injuries as a result.

39.     Mr. Mayo and other detainees pleaded for Jail staff to intervene and protect the non-rioting detainees, which pleas were ignored.

40.     The riot continued for more than an hour while at least forty Jail employees watched the mayhem from behind protective glass.

41.     Defendants Gavin, Jones-Hayes, and/or Delitz directed Jail staff to avoid entering Division 8/3G to restore order.

42.     After more than an hour of rioting, upon information and belief, the ERT entered the Division at the direction of Defendant Gavin, who told the ERT that all detainees in Division 8/3G had become hostile.

43.     The ERT, armed with weapons and accompanied by dogs, entered the Division and forcibly restrained all detainees, whether or not they participated in the riot.

**The ERT Ignores Mr. Mayo's Medical Needs Resulting in Serious Injuries to Mr. Mayo**

44.     Mr. Mayo was forcibly removed from his bed, clothed only in his underwear, and taken into the custody of Officer Buchanan and/or Lieutenant Douge.

45.     When Officer Buchanan and/or Lieutenant Douge began escorting Mr. Mayo out of the division, Mr. Mayo—a disabled veteran who is prescribed a cane that prohibits him from being cuffed while walking—informed them that he could not walk with his cane while cuffed. Officer Buchanan and/or Lieutenant Douge ignored Mr. Mayo, and forced him to walk while cuffed.

46.     When Mr. Mayo and Officer Buchanan and/or Lieutenant Douge approached a flight of stairs, Mr. Mayo requested that he be transported by elevator because his medical condition made it impossible to navigate stairs with a cane, especially while cuffed.

47.     During this same period, members of the ERT transported numerous other detainees who had mobility issues by elevator.

48.     Officer Buchanan and/or Lieutenant Douge ignored Mr. Mayo's plea and forced him to walk down several flights of stairs.

49.     While walking down the stairs, Mr. Mayo collapsed, sustaining serious back injuries.

50.     After his collapse, Mr. Mayo was left cuffed on the floor of the stairwell, in his underwear, for fifteen minutes.

51.     Mr. Mayo was then carried up a flight of stairs, placed in a wheelchair, and transported to Division 10.

52.     Defendants Gavin and Miller directed the ERT to transfer all Division 8/3G inmates to Division 10.

**Jail Staff Ignores Mr. Mayo's Serious Medical Needs in Division 10**

53.     Mr. Mayo was detained in a small cell in Division 10, still clothed only in his underwear, for 12 hours.

54.     Division 10 is not a medical division, and is thus not equipped to treat detainees with serious medical conditions like Mr. Mayo and all other Division 8/3G detainees.

55.     During this time, Mr. Mayo was not provided several critical medications he should have been administered, including: Iron supplements (to treat Mr. Mayo's anemia), Glipizide (to treat Mr. Mayo's diabetes), Clonidine (to treat Mr. Mayo's high blood pressure), Hydralazine (to treat Mr. Mayo's high blood pressure), Sevelamer (to treat Mr. Mayo's kidney failure), and Lasix (to treat Mr. Mayo's kidney failure).

56.     In the afternoon, Division 8/3G's charge nurse (Nurse Anderson) arrived at the Jail and expressed alarm that detainees with serious medical conditions were being held in small cells in Division 10 where their care could not be adequately managed.

57.     On April 30, 2020, Mr. Mayo filed a grievance relating to (1) the Jail's failure to protect him from rioting inmates, (2) the ERT's failure to attend to his medical needs as a disabled person who is prescribed a cane, leading to his collapse in the stairwell, and (3) the Jail's failure to provide him with his critical medications while he was detained in Division 10.

58.     Jail staff denied Mr. Mayo's grievance, and on May 12, 2020, Mr. Mayo requested an appeal pursuant to administrative procedures made available by the Jail.

59.     On May 14, 2020, Jail staff denied Mr. Mayo's request, stating that the Jail's "original response stands."

**Defendant Lombardi Assaults Mr. Mayo**

60.     Because of injuries sustained when he collapsed in the stairwell, Mr. Mayo was given a wheelchair by medical staff.

61.     On May 21, 2020, roughly three weeks following the riot, Defendant Lombardi, purporting to act at the direction of Dr. Haman, arrived at Mr. Mayo's living space to confiscate the wheelchair he had possessed since the riot.

62.     Mr. Mayo explained he required the wheelchair due to the injuries he suffered when he collapsed in the stairwell.

63.     Defendant Lombardi then transported Mr. Mayo in the wheelchair to the 3 West bullpen.

64.     In the 3 West bullpen, Sergeant Lombardi forcibly removed Mr. Mayo from the wheelchair, violently pulling Mr. Mayo out of the chair by his arm.

65.     Sergeant Lombardi then assaulted Mr. Mayo by slamming his head on the concrete floor in the course of piling his body onto Mr. Mayo's back, neck, and head, causing Mr. Mayo to briefly lose consciousness, and, upon information and belief, suffer a concussion.

66.     Mr. Mayo suffered substantial pain during and after this event, and continues to experience symptoms related to his head injury, including: dizziness, headaches, impaired memory/recall, and blurred vision.

67.     Defendant Lombardi then restrained Mr. Mayo against the wall in the bullpen.

68.     Mr. Mayo was restrained in the bullpen for roughly an hour until Sergeant Lupino arrived and directed that Mr. Mayo be uncuffed.

69.     Sergeant Lupino knew Mr. Mayo to be a rule-abiding, peaceful detainee, and inquired about the circumstances leading to Mr. Mayo being restrained.

70.     Mr. Mayo recounted the assault, and Sergeant Lupino asked Mr. Mayo whether he would provide a video narrative regarding the events.  Mr. Mayo provided such narrative.

**Sergeant Lombardi Attempts to Intimidate Mr. Mayo and Cover-up the Assault**

71. While Mr. Mayo was restrained in the 3 West bullpen, Sergeant Lombardi returned to Mr. Mayo's living space and, in full view of other detainees, proceeded to steal, scatter, and destroy Mr. Mayo's belongings.

72. Specifically, Sergeant Lombardi stole items Mr. Mayo had purchased from the Jail's commissary, ripped up Mr. Mayo's personal and legal documents, and threw books and other personal belongings of Mr. Mayo's onto the floor.

73. Later that same day, Mr. Mayo asked Sergeant Lombardi why he had engaged in this conduct. Sergeant Lombardi smiled and told Mr. Mayo "I was looking for your cane."

74. Upon information and belief, Sergeant Lombardi performed these actions in an attempt to intimidate Mr. Mayo and prevent him from pursuing discipline against Sergeant Lombardi for the assault.

75. Sergeant Lombardi subsequently issued Mr. Mayo a citation containing four charges emanating from the assault: Possession of Level 2 Contraband, False Reporting or False Statement, Disobeying or Resisting Orders, and Disorderly Conduct.

76. Sergeant Lombardi's supporting factual narrative contained patent falsehoods regarding Mr. Mayo's verbal and non-verbal responses to Sergeant Lombardi's attempt to confiscate the wheelchair given to Mr. Mayo by Jail medical staff.

77. Upon information and belief, Sergeant Lombardi issued the false citation to Mr. Mayo to cover-up the assault.

78. When inmates in Division 8/3G receive citations, they are provided a "hearing" during which they enter a plea. In practice and custom, citation hearings are held at the entrance to the detainee's tier.

79.     When the Jail held a hearing for the citation issued to Mr. Mayo by Sergeant Lombardi, it departed from this practice and held his hearing at an unknown location outside of Mr. Mayo's tier.

80.     Because of significant pain from injuries sustained during the April 29, 2020 riot and the May 21, 2020 assault, Mr. Mayo was unable to leave his living space to attend the hearing, and was thus found guilty of all charges in the citation for failure to attend the hearing.

81.     Upon information and belief, Sergeant Lombardi caused this deviation in citation hearing practice because he knew Mr. Mayo's injuries would preclude him from traveling to the hearing location and providing his version of the events, thereby furthering Sergeant Lombardi's attempt to cover-up his assault of Mr. Mayo.

**Sergeant Lombardi Embarks on a Persistent Campaign of Retaliation Motivated by Mr. Mayo's Resort to Grievance and Professional Misconduct Proceedings**

82.     On May 21, 2020, the same day of the assault, Mr. Mayo filed two grievances: one medical-related grievance and one regarding Sergeant Lombardi's assault.

83.     Mr. Mayo placed both grievances in a locked box designated for detainee grievances, and he observed a correctional officer collect the grievances and hand them to Ms. Scales, a social worker employed by the Jail who was tasked with resolving grievances.

84.     On or about June 6, 2020, Ms. Scales provided Mr. Mayo with the inmate carbon copy of his medical-related grievance.

85.     When Ms. Scales provided the inmate copy to Mr. Mayo, he asked Ms. Scales about the status of the assault grievance.  Ms. Scales responded that she was "still working on it."

86.     Almost a month later, on July 4, 2020, having never received the inmate carbon copy of his grievance related to Sergeant Lombardi's assault, Mr. Mayo filed another grievance reiterating the substance of the original grievance he filed on May 21, 2020.

87.     Mr. Mayo's second grievance was denied because it was filed more than 15 days after the assault.

88.     Because the Jail's employees, either intentionally or negligently, lost Mr. Mayo's grievance and then denied his replacement grievance as untimely, on July 30, 2020, Mr. Mayo filed a complaint regarding his assault at the hands of Sergeant Lombardi with the Cook County Office of Professional Review (OPR).

89.     On October 15, 2020, the OPR sent correspondence to Mr. Mayo relaying that it had "completed its review" of Mr. Mayo's complaint, but that "[d]ue to the confidentiality issues," it was "not at liberty to provide the findings of any investigation."

90.     Upon information and belief, Sergeant Lombardi was aware of Mr. Mayo's grievance and OPR complaint related to the assault, and would have been interviewed in connection with the OPR investigation.

91.     On September 22 and 24, 2020—after Mr. Mayo filed two grievances and one OPR complaint regarding Sergeant Lombardi's assault but before the OPR concluded its investigation—Sergeant Lombardi conducted "shakedowns" (searches for contraband) in Division 8/3G.

92.     During these shakedowns, Sergeant Lombardi specifically targeted Mr. Mayo and searched his living space.

93.     In the months preceding these shakedowns and continuing to present day, shakedowns were exceedingly rare in Division 8/3G, occurring roughly monthly and typically only in response to a discernable issue (e.g., a fight in the Division).

94.     On January 29, 2021, Sergeant Lombardi again singled Mr. Mayo out during a shakedown, and confiscated lidocaine patches for which Mr. Mayo had a prescription (to treat

14

pain from injuries sustained when he collapsed on the stairs during the April 29, 2020 riot, as well as pain from injuries sustained at the hands of Sergeant Lombardi).

95.     After confiscating the lidocaine patches that Mr. Mayo possessed pursuant to prescription, Sergeant Lombardi issued a citation to Mr. Mayo containing two charges for the lidocaine patches: Misuse of Medication and Possession of Level 2 Contraband.

96.     Aside from two citations issued by Sergeant Lombardi (one related to the assault and one for the lidocaine patches), Mr. Mayo has never received a citation in his more than three years of detention at the Jail.

97.     In April 2021, Sergeant Lombardi entered Division 8/3G in response to an inmate altercation not involving Mr. Mayo, who was laying on his bed.  When Sergeant Lombardi entered the deck he pointed at Mr. Mayo and said "you probably started the fight."

98.     On May 5, 2021, Sergeant Lombardi delivered mail to Divison 8/3G.  Mr. Mayo received legal mail that day, and the Jail's practice is to permit detainees to open their own legal mail while the Sergeant looks on to ensure it does not contain contraband.  Deviating from this practice, Sergeant Lombardi opened Mr. Mayo's legal mail, looked inside, and said "no drugs this time."

99.     On May 7, 2021, Jail staff issued new property bags to all 39 detainees in Division 8/3G.

100.     On May 8, 2021, Sergeant Lombardi entered Division 8/3G, walked past multiple living spaces with the new property bags in plain view, and proceeded to search under Mr. Mayo's bed, where he found Mr. Mayo's newly-issued property bag.  Sergeant Lombardi then confiscated the newly-issued property bag.

15

101.    Mr. Mayo then asked Sergeant Lombardi why he was continuing to single him out for harassment.  Sergeant Lombardi replied "because I can."

102.    After this exchange, Sergeant Lombardi confiscated the newly-issued property bags from two other inmates, informing them that they "can thank Mayo" for the confiscation of their property bags.

103.    Sergeant Lombardi did not confiscate the newly-issued property bags of the remaining 36 detainees in Division 8/3G.

104.    Upon information and belief, Sergeant Lombardi confiscated the property bags of the other two detainees in a transparent effort to obscure his retaliation against Mr. Mayo after Mr. Mayo publicly accused Sergeant Lombardi of singling him out for harassment.

105.    On February 23, 2022—less than two weeks after Mr. Mayo filed an Amended Complaint asserting claims against Sergeant Lombardi—Mr. Mayo was told by a correctional officer that he had received legal mail, and that he could retrieve it in the hallway outside of the tier.

106.    The Jail's practice is to deliver legal mail to inmates inside the tier.

107.    Mr. Mayo exited the tier to see Sergeant Lombardi holding his legal mail at the end of the hallway.

108.    There was no other Jail personnel present in the hallway.

109.    Once Mr. Mayo traveled down the hallway, Sergeant Lombardi opened the mail, flipped through the contents, and then handed Mr. Mayo the mail.

110.    Mr. Mayo's legal mail was prominently labeled as such, and the first page of the mail was a cover letter from Mr. Mayo's counsel in this action bearing prominent designations of

16

privilege and confidentiality.  The remainder of the mail consisted of as-filed versions of Mr.

Mayo's Amended Complaints, which center largely around Mr. Lombardi's conduct.

111.    Mr. Mayo and Sergeant Lombardi did not exchange conversation, but Sergeant

Lombardi's demeanor was intentionally intimidating.

112.    Sergeant Lombardi then followed Mr. Mayo back inside the tier where Sergeant

Lombardi delivered legal mail to another inmate, consistent with the Jail's ordinary practice.

113.    As a result of Sergeant Lombardi's persistent, retaliatory harassment of Mr.

Mayo, other detainees in Division 8/3G have taken collective efforts to protect Mr. Mayo from

Sergeant Lombardi when he enters the Division.

114.    Sergeant Lomardi's persistent, retaliatory harassment of Mr. Mayo has caused

Mr. Mayo to experience symptoms associated with post-traumatic stress disorder (PTSD), and he

has received mental health treatment for the same.

### COUNT I
**Section 1983 Claim Against Defendants Jones-Hayes, Gavin, and Delitz for Failure to Protect**

115.    Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in

this Count.

116.    In April of 2020, Mr. Mayo was incarcerated under conditions posing a

substantial risk of harm.

117.    This substantial risk of harm from rioting detainees existed before the April 29,

2020 riot, and was caused by the Jail's failure to maintain proper controls to ensure prison safety,

and the creation and maintenance of hostile relations with inmates due to the Jail's laissez faire

approach to the Covid-19 pandemic.  In addition, the Defendants named in this Count knew that

Mr. Mayo, as an inmate housed in Division 8/3G, was particularly vulnerable to violence and

17

physical mistreatment, and faced a substantial risk of serious harm from physical mistreatment

not shared by the general prison population.

118.     The substantial risk of harm was further caused by the presence of detainees being

housed in Division 8/3G whose violent or otherwise disruptive behavior at the Jail rendered them

flatly ineligible to reside, for any period of time, in a dormitory-style division.

119.     The Defendants named in this Count acted purposefully, knowingly, or recklessly

by failing to remedy, and actively contributing to, the conditions giving rise to the April 29, 2020

riot, and by failing to timely quell the riot, thereby failing to protect Mr. Mayo from injuries

sustained during and immediately after the riot.

120.     The above conduct was objectively unreasonable under the Fourteenth

Amendment's Due Process Clause.

121.     As a result of Defendants' unconstitutional conduct, Mr. Mayo suffered physical,

mental, and emotional injuries.

## COUNT II
### Section 1983 Claim Against Defendant Dart, in his official capacity, for Failure to Protect

122.     Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in

this Count.

123.     In April of 2020, Mr. Mayo was incarcerated under conditions posing a

substantial risk of harm.

124.     This substantial risk of harm from rioting detainees existed before the April 29,

2020 riot, and was caused by the Jail's failure to maintain proper controls to ensure prison safety,

and the creation and maintenance of hostile relations with inmates due to the Jail's laissez faire

approach to the Covid-19 pandemic.  In addition, the Defendants named in this Count knew that

Mr. Mayo, as an inmate housed in Division 8/3G, was particularly vulnerable to violence and

physical mistreatment, and faced a substantial risk of serious harm from physical mistreatment not shared by the general prison population.

125.     The substantial risk of harm was further caused by the presence of detainees in Division 8/3G whose violent or otherwise disruptive behavior at the Jail rendered them flatly ineligible to reside, for any period of time, in a dormitory-style division.

126.     Defendant Miller acted purposefully, knowingly, or recklessly by promulgating a policy under which no inmate in a covid-designated division (including Division 8/3G) could be transferred to another division without approval from an executive director.

127.     Upon information and belief, Defendant Miller enacted such policy either (1) at the direction of Defendant Dart, the final policymaker for the Cook County Sheriff's office, or (2) pursuant to Defendant Dart's delegation of final policymaking authority to Defendant Miller.

128.     In the alternative, and upon information and belief, Defendant Dart ratified Defendant Miller's issuance of such policy on or before April 28, 2020.

129.     The above policy was the moving force for the unrest on April 28, 2020 and April 29, 2020, as well as the failure to protect Mr. Mayo from injuries sustained during and immediately after the riot.

130.     As a result of the above policy, Mr. Mayo suffered physical, mental, and emotional injuries.

## COUNT III
### Section 1983 Claim Against Defendant Miller for Failure to Protect, in the Alternative to Count II

131.     Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

19

132.    In April of 2020, Mr. Mayo was incarcerated under conditions posing a substantial risk of harm.

133.    This substantial risk of harm from rioting detainees existed before the April 29, 2020 riot, and was caused by the Jail's failure to maintain proper controls to ensure prison safety, and the creation and maintenance of hostile relations with inmates due to the Jail's laissez faire approach to the Covid-19 pandemic.  In addition, the Defendants named in this Count knew that Mr. Mayo, as an inmate housed in Division 8/3G, was particularly vulnerable to violence and physical mistreatment, and faced a substantial risk of serious harm from physical mistreatment not shared by the general prison population.

134.    The substantial risk of harm was further caused by the presence of detainees in Division 8/3G whose violent or otherwise disruptive behavior at the Jail rendered them flatly ineligible to reside, for any period of time, in a dormitory-style division.

135.    Defendant Miller acted purposefully, knowingly, or recklessly by promulgating a policy under which no inmate in a covid-designated division (including Division 8/3G) could be transferred to another division without approval from an executive director.

136.    The above policy led directly to the unrest on April 28, 2020 and April 29, 2020.

137.    By enacting the above policy, Defendant Miller failed to protect Mr. Mayo from injuries sustained during and immediately after the riot.

138.    As a result of Defendant Miller's unconstitutional conduct, Mr. Mayo suffered physical, mental, and emotional injuries.

**COUNT IV**
**Section 1983 Claim Against Defendants Buchanan and Lieutenant Douge for Failure to**
**Attend to Mr. Mayo's Serious Medical Needs**

139.     Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

140.     Mr. Mayo suffered an objectively serious medical condition when he collapsed after having been forced to walk down several flights of stairs.

141.     Officer Buchanan and/or Lieutenant Douge acted purposefully, knowingly, or recklessly by forcing Mr. Mayo to navigate stairs despite his pleas (and visibly apparent need) to be transported by elevator.

142.     The conduct of Officer Buchanan and/or Lieutenant Douge was objectively unreasonable under the Fourteenth Amendment's Due Process Clause.

143.     Mr. Mayo suffered physical, mental, and emotional injuries as a result of Defendants' unconstitutional conduct.

## COUNT V
### Section 1983 Claim Against Defendants Gavin and Miller for Failure to Attend to Mr. Mayo's Serious Medical Needs

144.     Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

145.     Mr. Mayo had serious medical needs that required treatment—anemia, diabetes, high-blood pressure, and kidney failure.

146.     As a detainee in a Division specifically designed for the treatment of detainees with serious medical conditions, the Defendants named in this Count knew that failing to administer Mr. Mayo's required medications would present substantial risks of serious injury or death.

147.    The Defendants named in this Count acted purposefully, knowingly, or recklessly by detaining Mr. Mayo in a Division that could not support the treatment of his serious medical needs for 12 hours.

148.    The conduct of the Defendants named in this Count was objectively unreasonable under the Fourteenth Amendment's Due Process Clause.

149.    As a result of Defendants' conduct, Mr. Mayo was subjected to a significant risk of serious injury or death.

<u>COUNT VI</u>
**Section 1983 Claim Against Defendant Lombardi for Excessive Force**

150.    Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

151.    Defendant Lombardi purposely used force against Mr. Mayo by violently removing him from his wheelchair, slamming his head on the concrete floor, and piling his body onto Mr. Mayo's prostrate body.

152.    Defendant Lombardi's use of force was objectively unreasonable.

153.    As a result of Defendant Lombardi's unconstitutional conduct, Mr. Mayo suffered significant physical, mental, and emotional injuries.

<u>COUNT VII</u>
**Section 1983 Claim Against Defendant Lombardi for First Amendment Retaliation**

154.    Mr. Mayo repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

155.    By availing himself of grievance procedures and OPR complaints regarding Defendant Lombardi, Mr. Mayo engaged in activity protected by the First Amendment (incorporated against the states through the Fourteenth Amendment).

156.     Subsequent to Mr. Mayo's protected activity, Defendant Lombardi intentionally engaged in a persistent and egregious pattern of harassment.

157.     Defendant Lombardi's conduct would be likely to deter a person of ordinary firmness in Mr. Mayo's position from continuing to engage in protected activity.

158.     Defendant Lombardi's conduct was motivated by Mr. Mayo's protected activity.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Mayo requests this Court enter judgment in his favor and against Defendants Gavin, Jones-Hayes, Delitz, Lombardi, Miller, Buchanan, and Lieutenant Douge in their individual capacities, and Defendant Dart in his official capacity, jointly and severally or otherwise, and order the following relief:

i.      Compensatory damages in an amount according to proof;

ii.     Nominal damages;

iii.    Punitive damages in an amount to be determined at trial;

iv.     Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and § 1997e(d); and

v.      Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated:  June 3, 2022                        Respectfully submitted,

*/s/ David J. Zott*

David J. Zott, P.C.
Howard Michael Kaplan
Vivek Biswas *(admitted pro hac vice)*
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862 2000
Facsimile: (312) 862-2200
Email: dzott@kirkland.com
Email: howard.kaplan@kirkland.com
Email: vivek.biswas@kirkland.com

Jennifer M. Joslin *(admitted pro hac vice)*
John P. Hannon *(admitted pro hac vice)*
**KIRKLAND & ELLIS LLP**
60 East South Temple
Salt Lake City, UT 84111
Telephone: (801) 877-8100
Facsimile: (801) 877-8101
Email: jennifer.joslin@kirkland.com
Email: john.hannon@kirkland.com

*Attorneys for Plaintiff Michael C. Mayo*